**The HARVEST INSURANCE AGENCY, INC. and the Harvest Life Insurance Company, Appellants (Plaintiffs and Counter-defendants below),**

**v.**

**INTER–OCEAN INSURANCE COMPANY, Appellee (Defendant and Counter-claimant below).**

No. 4–484A101.

Court of Appeals of Indiana, Fourth District.

May 22, 1985.
Rehearing Denied June 27, 1985.

Theodore R. Boehm, Terrill D. Albright, Brian K. Burke, John C. Cahalan, Baker & Daniels, Indianapolis, James P. Buchanan, Buchanan & Buchanan, Lebanon, for appellants.

James A. McDermott, Michael Rosiello, Anne N. DePrez, M. Sue Michael, Barnes & Thornburg, Indianapolis, Thomas Whitsitt, Peyton, Giddings, Whitsitt, Baker & McClure, Lebanon, for appellee.

MILLER, Presiding Judge.

Plaintiffs-appellants Harvest Insurance Agency, Inc. and Harvest Life Insurance Co. (collectively "Harvest") and defendant-appellee Inter-Ocean Insurance Co. ("Inter-Ocean") have compiled a voluminous presentation concerning a preliminary injunction issuing from Boone Circuit Court. This injunction in essence prevents Harvest from replacing in-place health and accident insurance policies underwritten by Inter-Ocean in a seven-state area until a trial on the merits, as per a noncompetition covenant between the parties. After reviewing the comprehensive authority cited by both sides and studying the facts, we have reached the conclusion the trial court erred in one very basic respect: Inter-Ocean did not (and very possibly cannot) establish a prima facie case entitling it to relief because the noncompetition clause herein was drafted without limits, particularly geographic and temporal. Order dissolved.

## FACTS

Harvest is an insurance agency principally engaged in the sale of various kinds of insurance policies to farm and rural customers. The primary source of such clientele is through subscription lists of magazines targeted for residents of farm communities, such publications in one way or another being directly associated with Har-

vest either through licensing agreements or as other subsidiaries of Harvest's parent company. Harvest actually sells insurance in twelve states by approximately three hundred agents.

Inter-Ocean is an insurance company which issues accident and health insurance in 25 states. For over 37 years, Harvest has sold accident and health insurance underwritten by Inter-Ocean, and for the six years from 1978 through 1983, their relationship in the states of Indiana, Ohio, Michigan, Missouri, Nebraska, Colorado, and Kansas was governed by six separate written contracts. Each agreement provided an exclusive dealing arrangement for the respective states (except in eastern Indiana) and were substantially identical in their terms. Specifically, Inter-Ocean designated Harvest as its exclusive general agent for the sale of accident and health insurance policies through Harvest's appointed agents. In the event this relationship were ever terminated, the contracts provided that Inter-Ocean would continue to pay to Harvest renewal commissions for policies purchased during the life of those contracts. However, one provision also restrained Harvest's ability to compete with Inter-Ocean after such termination:

"12. *Insurance Sales After Termination of Agreement.* After the date of the termination of this Agreement either of the parties hereto, directly or through intermediaries, shall have the right to solicit Inter-Ocean policyholders for sales of additional insurance but neither shall have the right to replace existing coverage. Any such solicitation by [Harvest] for sales of insurance underwritten by other than Inter-Ocean shall not be deemed a violation of this Agreement. Additional insurance shall mean insurance sold to supplement or augment the insured's existing coverage and which does not replace such existing coverage."

In June, 1983, Harvest notified Inter-Ocean in writing that their relationship would be considered at an end at the conclusion of the agreements, in December, 1983. In September, 1983, Harvest found cause to file suit against Inter-Ocean and one Bernard Smit, a former Harvest state manager now employed by Inter-Ocean, for misappropriation of trade secrets and confidential information, for unfair competition, and for breach of certain contractual and fiduciary obligations. (Another former Harvest employee, Jack D. Hicks, was added as a party defendant shortly thereafter.) In early 1984, Inter-Ocean filed a counterclaim to prevent Harvest from continuing its systematic replacement of Inter-Ocean's health and accident policies in contravention of the contractual provision, a practice begun shortly after the six agency agreements terminated at the end of 1983. Hearing was held on this counterclaim for purposes of entering a preliminary injunction thereon, and on March 19, 1984, the trial court granted such relief. In doing so, the trial court made the following pertinent findings of facts and conclusions of law:

" * * *

7. Each of the Agreements expressly provides, in Paragraph 12, as follows:

12. *Insurance Sales After Termination of Agreement.* After the date of the termination of this Agreement, either of the parties hereto, directly or through intermediaries shall have the right to solicit Inter-Ocean policyholders for sales of additional insurance but neither shall have the right to replace existing coverage. Any such solicitation by General Agent [i.e., Harvest Agency] for sales of insurance underwritten by other than Inter-Ocean shall not be deemed a violation of this Agreement. Additional insurance shall mean insurance sold to supplement or augment the insured's existing coverage and which does not replace such existing coverage.

\* \* \* \* \* \*

CONCLUSIONS OF LAW

\* \* \* \* \* \*

6. The contractual obligation not to replace Inter-Ocean Coverage is not unreasonably overbroad. Agreements prohibiting solicitation of existing customers

to protect the goodwill for which one has been paid are enforceable, *even though lacking geographical or time limitations.* Because replacement is forbidden only as to a specific and limited class— Inter-Ocean policyholders who purchased their coverage through Harvest Agency—there is no need for limitations in other terms. *Seach v. Richards, Dieterle & Co.* (Ind.App.1982), 439 N.E.2d 208; *Ebbeskotte v. Tyler* (1957), 127 Ind. App. 433, 142 N.E.2d 905.

7. Inter-Ocean has established a prima facie case that Harvest Agency has breached, and intends to continue to breach, Paragraph 12 of the Agreements. *State ex rel. Haberkorn v. DeKalb Circuit Court* (1968), 251 Ind. 283, 291, 241 N.E.2d 62, 67. *See also Tuf-Tread Corp. v. Kilborn* (1930), 202 Ind. 154, 172 N.E. 353; *Indiana Annual Conference Corp. v. Lemon* (1956), 235 Ind. 163, 131 N.E.2d 780.

\* \* \* \* \* \*

13. Inter-Ocean has established a prima facie case and an injunction is needed to preserve the status quo.

\* \* \* \* \* \*

20. Harm to the Harvest Companies must also be weighed against the degree to which Inter-Ocean is likely to succeed on the merits. *Securities & Exchange Comm'n v. World Radio Mission, Inc.* (1st Cir.1976), 544 F.2d 535; *Teledyne Industries, Inc. v. Windmere Products, Inc.* (S.D.Fla.1977), 433 F.Supp. 710. Moreover, the importance of the balance of the hardships test is diminished where, as here, Harvest has willfully violated a known contactual [sic] right of Inter-Ocean. *Flower Haven, Inc. v. Palmer* (Colo.App.1972), 502 P.2d 424, 426; *Orkin Exterminating Co. v. Burnett* (1967), 259 Iowa 1218, 146 N.W.2d 320, 326–27. Inter-Ocean has shown a strong probability of success on the merits of its claim that Harvest has breached, and is breaching, Paragraph 12 of the Agreement.

21. In light of the facts presented and the law, the Court finds that the balance of hardships tips in favor of Inter-Ocean.

22. The public interest is served by enforcement of voluntarily made contracts whose terms make them neither illegal nor contrary to public policy. *Unishops, Inc. v. May's Family Centers, Inc.* (Ind.App. [1980] ), 399 N.E.2d 760, 764; *Oxman v. Profit[t]* (1962), 241 S.C. 28, 126 S.E.2d 852. Thus, issuance of this injunction will not disserve the public interest.

\* \* \* \* \* \*

24. The public will not be prejudiced by enforcement of Paragraph 12. Enjoining Harvest Agency from replacing existing coverage will not limit the availability of accident or health insurance in the seven-state area since there are many other competitors in that area.

\* \* \* \* \* \*

*Preliminary Injunction*

WHEREFORE, the court hereby enters the following preliminary injunction against the Harvest Companies with respect to its insurance sales in the states of Ohio, Michigan, Indiana, Kansas, Missouri, Nebraska, and Colorado:

1. The Harvest Companies are ordered to use an application procedure which requires their agents to determine from the applicant, and to record in writing at the time of application: (a) all types of Harvest coverage applied for; (b) all types of Inter-Ocean Coverage in force; and (c) whether an application involves a replacement or intended replacement of Inter-Ocean Coverage.

2. The Harvest Companies are ordered to instruct and require their agents not to solicit or accept any application that involves replacement or intended replacement of Inter-Ocean Coverage.

3. The Harvest Companies are ordered to review all applications submitted by their agents, and to take all reasonable steps to ensure that none of the applications involves replacement or

intended replacement of Inter-Ocean Coverage.

4. Where the Harvest Companies know, or should know, that an application submitted by an agent involves a replacement or intended replacement of Inter-Ocean Coverage, the Harvest Companies are ordered to reject the application and to return the application materials immediately to the applicant. If an application seeks insurance that does not constitute a replacement, in addition to insurance that would replace Inter-Ocean Coverage, the application shall still be rejected and returned immediately to the applicant, but the agent may thereafter complete a new application for the non-replacement insurance.

5. It is ordered that the Harvest Companies shall not issue any accident or health insurance policy that they know, or should know, replaces or is intended to replace Inter-Ocean Coverage.

6. Apart from the orders set forth above, this preliminary injunction places no restriction on the solicitation for sale or the sale by the Harvest Companies of any accident, health, or life insurance.

7. The Harvest Companies are ordered to deliver a copy of this preliminary injunction within 7 days to each of its State Managers, Assistant State Managers, District Managers, and agents in the states of Ohio, Michigan, Indiana, Nebraska, Kansas, Missouri, and Colorado; and the Harvest Companies are ordered to certify to the Court within 10 days that such copies have been delivered.

8. Inter-Ocean is ordered to post a preliminary injunction bond in the amount of $850,000.00 within 5 days...."

(Record, pp. 2566–91.) (Emphasis added.)

### DECISION

In order to justify the issuance of a preliminary injunction, the moving party must establish its entitlement to such a harsh measure. To do so, that party must show (1) its "remedies at law are inadequate thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue"; (2) it has a "reasonable likelihood of success at trial by establishing a prima facie case"; (3) the injury threatening it (the movant) "outweighs the threatened harm the grant of the injunction may inflict on the defendant"; and (4) the public interest would not be disserved by the grant of the injunction. *Indiana Pacers L.P. v. Leonard* (1982), Ind.App., 436 N.E.2d 315, 318; *Indiana Annual Conference Corp. v. Lemon* (1956), 235 Ind. 113, 131 N.E.2d 780; *Mid-America Marketing, Inc. v. Falender Development Corp.* (1980), Ind.App., 406 N.E.2d 372. In the action here, Inter-Ocean's most glaring deficiency in its case for an injunction is its failure to establish a prima facie case on the elements for enforcement of the covenant.

When reviewing a trial court's ruling on a motion for a preliminary injunction, we are confined to determining whether the court abused its discretion. *Joseph Guidone's Food Palace, Inc. v. Palace Pharmacy, Inc.* (1969), 252 Ind. 400, 248 N.E.2d 354; *Indiana Pacers L.P. v. Leonard, supra; Mid-America Marketing, Inc. v. Falender Development Corp., supra; Rees v. Panhandle Eastern Pipe Line Co.* (1978), 176 Ind.App. 597, 377 N.E.2d 640. We decide a trial court has abused its discretion when it has made a decision that is clearly erroneous—one against the logic and effect of the facts and circumstances presented or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* Our task here boils down to investigating whether the findings of fact, made by the court and as required for a preliminary injunction pursuant to Ind.Rules of Procedure, Trial Rule 52(A), are sufficient to validly support the result reached in the court's decision and, that done, whether those findings are supported by evidence of probative value. *Steenhoven v. College Life Insurance Co. of America* (1984), Ind. App., 458 N.E.2d 661. Additionally, we may not weigh conflicting evidence but may only consider that evidence supporting

the trial court's findings, conclusions, and order. *Wells v. Auberry* (1982), Ind.App., 429 N.E.2d 679. Inter-Ocean's preliminary injunction here must fail because the court's findings with regard to Inter-Ocean's prima facie case do not factually support preliminary relief and, in fact, may well even prevent, if established at a trial on the merits, permanent relief as a matter of law. Thus, we conclude the trial court abused its discretion in granting the order.

■ The establishment of a prima facie case for relief on the merits rests on the party seeking relief. *Steenhoven v. College Life Insurance Co. of America, supra.* Such applicant is not required to plead and prove a case that shows he will ultimately be entitled to relief. *E.g., Kramer v. Rager* (1982), Ind.App., 441 N.E.2d 700. "It is necessary only that the pleadings and evidence be such that it makes out a case for a proper investigation in equity and that the status quo be maintained pending such trial on the merits." *Indiana Annual Conference Corp. v. Lemon, supra,* 235 Ind. at 167, 131 N.E.2d at 782; *Rees v. Panhandle Eastern Pipe*

*Line Co., supra; Powell v. Powell* (1974), 160 Ind.App. 132, 310 N.E.2d 898. Thus, Inter-Ocean was merely required to show that Harvest's breach of the noncompetition covenant justified a court-ordered halt to such activities pending further inquest. Inter-Ocean has not borne this burden successfully.

■ Our quest necessarily begins with the basic query: What was crucial to the foundation of Inter-Ocean's prima facie case? The most elementary fact in its case, the indispensable fulcrum, is the validity of the noncompetition covenant itself—whether its terms were reasonable with respect to (1) the necessity of the breadth of the protection for the covenantee (Inter-Ocean); (2) the restriction upon the covenantor (Harvest); and (3) the public interest. *Licocci v. Cardinal Associates, Inc.* (1983), Ind., 445 N.E.2d 556; *Seach v. Richards, Dieterle & Co.* (1982), Ind.App., 439 N.E.2d 208; *Slisz v. Munzenreider Corp.* (1980), Ind.App., 411 N.E.2d 700. Such covenants in restraint of trade are not favored by the law,[1] *Search v.*

---

1. We confine ourselves in this opinion almost exclusively to authority based upon noncompetition covenants governing the termination of a business relationship. The most prevalent relationship in our case law on this issue is, of course, that of employer-employee. *E.g., Licocci v. Cardinal Associates, Inc.* (1983), Ind., 445 N.E.2d 556 (salesmen); *Captain & Co. v. Towne* (1980), Ind.App., 404 N.E.2d 1159 (manager); *Miller v. Frankfort Bottle Gas, Inc.* (1964), 136 Ind.App. 456, 202 N.E.2d 395 (deliveryman). However, our courts have also dealt with noncompetition covenants when relations have been between a franchisor and franchisee, *McCart v. H & R Block, Inc.* (1984), Ind.App., 470 N.E.2d 756, between a licensee and licensor, *Unishops, Inc. v. May's Family Centers, Inc.* (1980), Ind.App., 399 N.E.2d 760, between a corporation and an independent dealer, *Willis v. Dictograph Sales Corp.* (1944), 222 Ind. 523, 54 N.E.2d 774, and between a professional corporation and an individual partner, *Raymundo v. Hammond Clinic Association* (1983), Ind., 449 N.E.2d 276. Inter-Ocean argues these cases are not analogous to the situation here where a principal-agent relationship is involved and argues for the application of different principles. Inter-Ocean contends that we should confine ourselves to cases wherein the seller of a business or professional practice covenants not to compete with the new purchaser. *See, e.g. Con-*

*sumers' Oil Co. v. Nunnemaker* (1895), 142 Ind. 560, 41 N.E. 1048 (sale of oil and gas business); *Beatty v. Cable* (1895), 142 Ind. 329, 41 N.E. 590 (sale of medical practice); *Young v. Van Zandt* (1983), Ind.App., 449 N.E.2d 300 (sale of commercial business); *Lawrence v. Cain* (1969), 144 Ind.App. 210, 245 N.E.2d 663 (sale of photography studio). The advantage to Inter-Ocean in applying the law in "sale-of business" cases rather than "business relationship" cases is apparent: noncompetition covenants as part and parcel of the sale of a business or of property are viewed more indulgently than those in the typical employer-employee relationship, and broader restrictions are allowed. *Seach v. Richards, Dieterle & Co.* (1982), Ind.App., 439 N.E.2d 208. However, Inter-Ocean has not been able to convince us that its relationship with Harvest is anything but that of principal and agent as per its written contract (although Inter-Ocean makes an argument it was engaged in a joint venture with Harvest) nor that such relationship is not more nearly analogous to an employer-employee type of case than to a sale of business type of case. Therefore, we will generally apply the stricter review of business relationship cases to the instant action. *See also Willis v. Dictograph Sales Corp., supra* (principles of employer-employee noncompetition cases applicable to independent dealer relationship); *cf. Kingan &*

*Richards, Dieterle & Co., supra,* and are scrutinized carefully as to their reasonableness. *Id.* "Reasonableness," as the boundary of the restraint, is a question of law which must rest upon adequate facts, *Raymundo v. Hammond Clinic Association* (1983), Ind., 449 N.E.2d 276; *Slisz v. Munzenreider Corp., supra,* as gathered from the totality of the circumstances. *4408, Inc. v. Losure* (1978), 175 Ind.App. 658, 373 N.E.2d 899; *Frederick v. Professional Building Maintenance Industries, Inc.* (1976), 168 Ind.App. 647, 344 N.E.2d 299. These circumstances include the scope of the covenantee's legitimate business interests and the actual restraints detailed in the covenant in terms of temporal, geographic and behavioral prohibitions. *Licocci v. Cardinal Associates, Inc., supra; Slisz v. Munzenreider Corp., supra.* And upon Inter-Ocean, as the proponent of the covenant's enforcement, rests the burden of proof in support thereof. *See Licocci v. Cardinal Associates, Inc., supra; Slisz v. Munzenreider Corp., supra; Frederick v. Professional Building Maintenance Industries, Inc., supra.* It is in this manner that Inter-Ocean has failed by being unable to establish findings of fact sufficient to support the trial court's conclusions of law.

■ A threshold matter we must first clear up was raised by Harvest after the hearing on the injunction—the matter of which state's law prevails with regard to these six agreements governing seven states. Inter-Ocean declares Harvest has waived the issue by its failure to raise it in a timely fashion. We believe Harvest adequately fulfilled its duty to bring the problem to our attention by including it in the motion to correct errors [2] for, as we will explain, the burden was upon Inter-Ocean to present the proper state laws in the trial court, which it did not do.

■ We remind the parties that in order to avail itself of a noncompetition covenant, the proponent thereof has the burden of establishing the reasonableness of three factors: (1) the interest of the covenantee (2) the restraint upon the covenantor, and (3) the impact upon the public. Inter-Ocean's case herein was grossly deficient in establishing the third component, public policy—in this case, applicable state law.[3]

---

Co. v. Silvers (1894), 13 Ind.App. 80, 37 N.E. 413 (commonality of employer-employee and principal-agent relationships).

2. With regard to Harvest's alleged waiver of the issue regarding the choice of law problem, we refer the parties to *Klaxon Co. v. Stentor Electric Mfg. Co.* (1941), 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, where the U.S. Supreme Court raised the choice of law issue *sua sponte* and to *Award Incentives, Inc. v. van Rooyen* (3d Cir. 1959), 263 F.2d 173, where the Third Circuit Court of Appeals addressed the issue as first presented on appeal, despite an argument of waiver.

3. "Public policy," with regard to contract provisions, has been defined as follows:

"Public policy is a term that is not always easy to define. It may vary as the habits, opinions, and wants of a people may vary, and what may be the public policy of one state or country, may not be so in another. The principle of public policy seems to have been earliest applied to agreements to promote litigation, or marriage, or in an endeavor to elude the binding effect of wagers at common law. The field of application has been an ever-increasing one. *In the absence of a showing that any particular contract*

brought before the court is contrary to what the Constitution, the Legislature, or the judiciary have declared to be the public policy, it is necessary in order to have the court hold it void on the ground of public policy, to show clearly that such contract has a tendency to injure the public, or is against the public good, or is inconsistent with sound policy and good morals as to the consideration or as to the thing to be done or not to be done. Whether or not a contract is against public policy is a question of law for the court to determine from all of the circumstances in a particular case. The courts will keep in mind the principle that it is to the best interest of the public that persons should not be unnecessarily restricted in their freedom of contract and that their agreements are not to be held void as against public policy, unless they are clearly contrary to what the Constitution, the Legislature, or the judiciary have declared to be the public policy, or unless they clearly tend to the injury of the public in some way." *Hodnick v. Fidelity Trust Co.* (1932), 96 Ind.App. 342, 349, 183 N.E. 488, 491 (emphasis added); *Franklin Fire Ins. Co. v. Noll* (1945), 115 Ind. App. 289, 58 N.E.2d 947. We, therefore, conclude that the public policy component of a valid noncompetition covenant is a requirement

Inter-Ocean blithely argues Indiana law applies here, without taking into consideration three important points: (1) the contracts were executed in Ohio; (2) each contract implies the parties agreed to be bound by the respective state laws of each contract; and (3) Indiana's choice of law principles with regard to noncompetition covenants are in Harvest's favor. Even acknowledging Harvest's responsibility to raise a choice of law issue at hearing with regard to Ohio as the place of execution (or be otherwise bound by the presumption that Indiana's law is the same, *see, e.g., County of Ventura, California v. Neice* (1982), Ind.App., 434 N.E.2d 907; *see also In re Marriage of Mulvihill* (1984), Ind. App., 471 N.E.2d 10), Inter-Ocean must lose on points two (contractual agreement of applicable law) and three (choice of law principles).

■■■ Each agreement contains a paragraph 10 which states:

"10. *Separability of Provisions.* If any clause of this Agreement shall be found invalid under the laws of the State of Indiana *[Ohio], [Michigan], [Missouri], [Nebraska & Colorado], [Kansas],* this Agreement shall, nevertheless, remain in full force and effect in such state in all other respects except for such invalid clause."

Record, p. 169 [235, 266, 297, 329, 362]. It appears to us that the parties have agreed, in this paragraph, to the application of the state laws pertinent to each contract whereupon it became incumbent for Inter-Ocean, *within its burden of proof,* to establish what those state laws were with respect to each noncompetition covenant. No choice of law issue arises where the parties have agreed on the applicable law, *Suyemasa v. Myers* (1981), Ind.App., 420 N.E.2d 1334; *Jameson Chemical Co. v. Love* (1980), Ind.App., 401 N.E.2d 41, *modified on other grounds,* but here, Inter-Ocean has failed to present its case in light of any of those state laws except Indiana's.

■■■ Irrespective of any contractual provisions agreeing on applicable law, point three above (choice of law principles) makes it abundantly clear that the application of any such chosen law to a noncompetition covenant must surrender "to the public policy of the state having a materially greater interest in the transaction and the parties." *South Bend Consumers Club, Inc. v. United Consumers Club, Inc.* (N.D.Ind.1983), 572 F.Supp. 209, 212. Thus, Inter-Ocean was compelled to answer these two questions about each of the agreements: Does [state], the state of performance, have a materially greater interest in the transaction and the parties than any other state (in this case, Indiana, as the locus of litigation)? Is the enforcement of this noncompetition covenant contrary to the public policy of such [state]? *Id.* In answer, we must conclude the respective states of each contract have a greater interest in regulating business relationships within its borders than any other state's (*i.e.*, Indiana's) generalized interest in protecting interstate contracts. *See Barnes Group, Inc. v. C & C Products* (4th Cir. 1983), 716 F.2d 1023 (validity of Ohio noncompetition covenant in Alabama, Louisiana, Maryland and South Carolina). We believe these two federal cases we have cited stand for the proposition that Inter-Ocean, having the burden of proof on the issue of public policy, was compelled by principles of choice of law to establish the legality of each contract with respect to its individual state of performance. Having failed to do so, except for Indiana, we find Inter-Ocean failed to establish a prima facie case for injunctive relief in Ohio, Michigan, Missouri, Nebraska, Colorado, and Kansas. *See generally* Annot., 70 A.L. R.2d 1292 (1960). The trial court thus abused its discretion, because in the absence of Inter-Ocean's facts, it could not, and did not, have findings of fact sufficient to sustain an injunction in those states.

---

for showing its fundamental legality, not to mention such legality as must be proven upon inspecting its scope of protection for the other

two factors (covenantee's interest and covenantor's restriction).

The order pertaining thereto is hereby dissolved.

Inter-Ocean has also failed to establish a prima facie case for the covenant's validity even under Indiana's laws.

To more clearly grasp the problem the parties have wrestled with, we produce once more the villainous covenant:

"12. *Insurance Sales After Termination of Agreement.* After the date of the termination of this Agreement either of the parties hereto, directly or through intermediaries, shall have the right to solicit Inter-Ocean policyholders for sales of additional insurance but *neither shall have the right to replace existing coverage.* Any such solicitation by General Agent [Harvest] for sales of insurance underwritten by other than Inter-Ocean shall not be deemed a violation of this Agreement. Additional insurance shall mean insurance sold to supplement or augment the insured's existing coverage and which does not replace such existing coverage." (Emphasis added.)

The emphasized portion is the actual non-competition restraint—"neither shall have the right to replace existing coverage." The trial court's finding of facts, as reproduced above, interpreted this phrase to mean that Harvest is forbidden from replacing insurance policies only with regard to "Inter-Ocean policyholders who purchased their coverage through Harvest Agency." Conclusion of Law # 6, *supra.* It thus concluded that the covenant's lack of any other limitations (temporal and geographic) was excused because the restraint was limited to a certain class of policyholders. This covenant might in all likelihood be upheld if indeed the trial court's interpretation were correct. *See, e.g., Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208. However, the contract provision bargained for obviously does not contain this class limitation, and the trial court abused its discretion because its one finding of fact on

the issue (the covenant itself, Finding of Fact # 7) does not support its conclusions of law thereon.

■ The wording of the covenant is spare, precise, and to the point although we must engage in some grammatical legerdemain to put it in its proper perspective. For example, we must add "Harvest" and "Inter-Ocean" to the phrase to define "neither" (as it relates to its antecedent "the parties hereto.") We also are confronted with the words "existing coverage." To these we attach their usual and common meaning (*e.g., Piskorowski v. Shell Oil Co.* (1980), Ind.App., 403 N.E.2d 838; *Fort Wayne Bank Building v. Bank & Equipment Corp. of America* (1974), 160 Ind. App. 26, 309 N.E.2d 464) and keep in mind they are couched within covenant language regarding an insurance agency relationship. *Slisz v. Munzenreider Corp., supra,* 411 N.E.2d 700.[4] Thus, "coverage," as commonly meaning "protection by insurance policy," (WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 525, ("coverage") (1976)) refers to insurance protection of Inter-Ocean policyholders mentioned earlier in the sentence. "Existing" is defined as "having actual or real being," *id.* at 796, ("exist"), and at law, is "not necessarily confined to the present." BLACK'S LAW DICTIONARY 684, ("existing") (1968). Therefore, in the temporal context of the entire covenant, "[a]fter the date of the termination of this Agreement," "existing coverage" pertains to "Inter-Ocean insurance policies in being after the contract terminates." Our kernel phrase here actually says:

"Neither Harvest nor Inter-Ocean shall have the right to replace Inter-Ocean insurance policies in being after the contract terminates."

This is obviously not the meaning attributed to it by the court but it is the only

---

**4.** "[W]e first look to the language of the covenant itself, since it is only by looking at the 'interrelation' of the 'proscribed activity' in connection with the particular time constraint and the nature of the 'protectible [sic] interest'

that a court on appeal may decide the outcome in a·given case."
*Slisz v. Munzenreider Corp.* (1980), Ind.App., 411 N.E.2d 700, 707.

meaning allowed by its language and the law.

 Inter-Ocean argues that we cannot take the covenant at face value but must instead determine its true intent from the contents of the entire contract. However, we may not engage in judicial construction by looking at the entire contract unless the covenant is ambiguous. *See Jenkins v. King* (1946), 224 Ind. 164, 65 N.E.2d 121; *Piskorowski v. Shell Oil Co., supra.* By defining the simple words used in this covenant, we do not believe reasonable men would find it subject to more than one interpretation. *See Boswell v. Lyon* (1980), Ind.App., 401 N.E.2d 735. Thus, the covenant is not ambiguous, and we are not at liberty to grant Inter-Ocean's wish that we give these words meanings interpreted by unnecessary judicial construction. The covenant itself is sufficiently clear to show that the parties bargained for an explicit trade restraint. We may not change the covenant the parties entered into by giving it a meaning that was not bargained for, *see Jenkins v. King, supra; Piskorowski v. Shell Oil Co., supra; Fort Wayne Bank Building, Inc., supra,*[5] and we may not enforce an unreasonable covenant under the guise of interpretation, *Slisz v. Munzenreider Corp., supra,* 411 N.E.2d 700. Inter-Ocean's arguments to the contrary must fail.

Going back to the promise not to compete—

"Neither Harvest nor Inter-Ocean shall have the right to replace Inter-Ocean insurance policies in being after the contract terminates"—

we believe we are amply justified in finding this restraint unreasonable.

 Reasonableness, we reiterate, is the conclusion we must reach after looking at the circumstance of each individual prohibitive covenant—such circumstances as the covenantee's legitimate business interests and the actual limitations of the restraint in terms of time, geography, and behavior. In the instant case, assuming for the moment that Inter-Ocean has a legitimate business interest in its policies and is entitled to protection, we discover that the restraint is otherwise without limit. There is no geographic limitation such that Harvest, which operates only in twelve states, may not replace Inter-Ocean policies in at least 25 states where Inter-Ocean deals in health and accident insurance. The breadth of this restraint, by being without limit, goes far beyond Harvest's total sphere of operation not to mention the scope of its contractual relations with Inter-Ocean. In the absence of allegations that Harvest is in possession of trade secrets that could threaten Inter-Ocean's interest in its existing coverage, such an overbroad geographic area is unenforceable, and the covenant is void. *See, e.g., Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 127 N.E.2d 235,[6] *Slisz v. Munzenreider Corp., supra,* 411 N.E.2d

---

**5.** We believe it is also pertinent to point out that noncompetition covenants are valid only if they are ancillary to the main contract. *See, e.g., Super Maid Cook-Ware Corp. v. Hamil* (5th Cir.), 50 F.2d 830, *cert. denied* (1931) 284 U.S. 677, 52 S.Ct. 138, 76 L.Ed. 572; *Milgram v. Milgram* (1938), 105 Ind.App. 57, 12 N.E.2d 394. These covenants govern the protection of certain business interests and are not the subject of the main contract. They have a life of their own upon an agreement not to compete within reasonable restrictions. These should be explicitly drawn. We find it a highly dubious proposition to suggest that a virtually unrelated promise in the main contract would govern the ancillary agreement of the noncompetition covenant. We might never know what the parties actually agreed upon if we followed such practice. We therefore decline to do so. *See also* note 4,

*supra* (we consider the language of a covenant first without regard to the rest of the contract).

**6.** In *Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 127 N.E.2d 235, an employee entered into a contract with his employer, which included a noncompetition clause our supreme court ruled to be too broad geographically. The employee was a sales representative whose territory was limited to northern Indiana. The covenant, however, forbade competition, anywhere in the United States and Canada. Such covenant "was unreasonable to the extent that it attempted to restrict the gainful employment of [Donahue] beyond the area of his former employment," *id.* at 412, 127 N.E.2d at 241, because it was unnecessary for the company's protection and too restrictive of Donahue's future employment.

700; *4408, Inc. v. Losure, supra,* 373 N.E.2d 899.

■ The covenant also is indefinite as to the period of time for which enforcement is sought. Inter-Ocean contends it is reasonable to set the limit at the life of existing policies. What Inter-Ocean does not comprehend is that "existing," as it is commonly and legally understood, is not confined to the present. In other words, "existing" policies may also encompass any and all Inter-Ocean policies hereafter executed. Future policies are not a protected interest, therefore the covenant is void on this point alone, *see Seach v. Richards, Dieterle & Co., supra,* 439 N.E.2d 208, as seeking protection for a portion of business with which Harvest was never associated.

■ A covenant of indefinite duration is also void in and of itself. *See Licocci v. Cardinal Associates, Inc., supra,* 445 N.E.2d 556 (protection of employer's good will is reasonable "if limited to a reasonable period." *Id.* at 561); *College Life Insurance Co. of America v. Austin* (1984), Ind.App., 466 N.E.2d 738; *Frederick v. Professional Building Maintenance Industries, Inc.* (1976), 168 Ind.App. 647, 344 N.E.2d 299, n. 1; *generally* Annot., 41 A.L.R.2d 15 (1955). (Such conclusion is not to be confused with covenants for indefinite duration in contracts for a sale of business. *E.g., Ebbeskotte v. Tyler* (1957), 127 Ind.App. 433, 142 N.E.2d 905; *generally* Annot., 45 A.L.R.2d 77 (1956).) Add this element to lack of spatial limitations, and the covenant is ipso facto against public policy.

■ We are doubtful whether Inter-Ocean even has any business interest worthy of protection, even if we were to assume the restraints Inter-Ocean claims and the trial court found to exist in the covenant. The covenantee (here Inter-Ocean) must show "special facts" that would give the covenantor (Harvest) a special competitive advantage which could be harmful to the covenantee if unrestrained, *Slisz v. Munzenreider, Corp., supra,* 411 N.E.2d 700, or that the covenantee is entitled to protect his "good will." *Licocci v. Cardinal Associates, Inc., supra,* 445 N.E.2d 556. "Special facts" include such things as trade secrets, knowledge of "unique" services, and confidential information. *Slisz v. Munzenreider Corp., supra.* Inter-Ocean makes no allegations in this regard. However, it does contend the covenant is necessary to protect its good will. We disagree.

■ "Good will" is generally defined as an advantageous familiarity and personal contact with customers (such, of course, may include the "special facts" mentioned above). *Licocci v. Cardinal Associates, Inc., supra.* Inter-Ocean does not possess any good will. It is without dispute that Harvest cultivated the clients through its farm publications and that its agents, not Inter-Ocean's, contacted the clients. In contrast to the facts in *Miller v. Frankfort Bottle Gas, Inc.* (1964), 136 Ind.App. 456, 202 N.E.2d 395, where the covenantee's customers were oftimes retained on the basis of the personality of the deliveryman on that particular route, here Inter-Ocean has not established that it has any customers in the area to retain. It appears all its customers as governed by the contracts were only obtained through Harvest's agency. We fail to see that Inter-Ocean has created any business "good will" at all. Rather, Harvest solicited the business from subscription lists of its subsidiary and/or licensee farm publications. Thus, it possesses a familiarity and personal contact with clients that Inter-Ocean shares only with respect to revenue and long-distance claim adjustments from its office in Cincinnati. Inter-Ocean possessed no business interest worthy of protection, and the covenant is therefore void in this respect also. *See Iroquois Industries Corp. v. Popik* (1980), 91 Ill.App.3d 505, 47 Ill.Dec. 279, 415 N.E.2d 4.

We conclude the trial court's findings do not support his conclusions that the covenant here was valid. In the absence of such conclusion, Inter-Ocean cannot show it mounted a prima facie case, and the preliminary injunction was improvidently and er-

roneously granted as an abuse of discretion.

Order dissolved and remanded for further proceedings.

CONOVER and YOUNG, JJ., concur.